Thank you. The next case for council is present. Number 2731 11 against fisher 깃ika I'm sorry. I'm a broker against the department of energy.  Proceed whenever you're ready. Thank you, Your Honor. Good morning, Your Honors. Sorry for the inconvenience this morning. I had some trouble getting here. And I thank the court for coming with us. We coped. May it please the court, my name is Morris Fisher. I represent the appellant in this case, Mr. Homi Amramokri. And could I recite for the court a brief recitation of the critical facts and issues that are at the bar in this case? Yes.  Yes, please. Thank you, Your Honor. On February 1, 2005, and this is a joint appendix 462, there was an email which was sent by Mr. Amramokri's second level supervisor, Mr. Miocla. And what Mr. Miocla had done in that email is he had rejected any opportunity that Mr. Amramokri would have to apply a regulation known as 10 CFR 830. And it had been suggested that Mr. Amramokri do some sort of study, which was part of his job. And this was suggested that to identify all nuclear facilities that any is responsible for then in determining the status of their compliance with DSA. And the response was by Mr. Lode and Mr. Miocla that it's not a good idea to turn Homi loose on DSAs or older facilities that required some thoughtful interpretation of 10 CFR 830. And the question ultimately in this case is why was there a reduction of Mr. Amramokri's duties, that one in particular, in February 1 of the year 2005? Well, the question is whether that reduction was in retaliation for the whistleblowing. Isn't that right? My perception of the agency's argument is that this is an action that would have been taken any way that some of the action had already been taken before the whistleblowing occurred, accepting that at least some of the communications can be called whistleblowing. My perception is that that is the strongest argument and one that must be overcome. That's correct, Your Honor. And I'm here to overcome it if I can. I would agree that there was some action which was taken to Mr. Amramokri before February 1, 2005. I would agree that there was some disciplinary issues that had to do with rude behavior and of the sort in the Oak Ridge Facility Lab in May of 2003. However, I would submit to the court that the reduction of the duties, in particular, his failure to apply that particular regulation, regulation that he complained about in his protected disclosures, was not addressed in any way, shape, or form by the agency, in this case, in the course of reassigning his duties. And in fact, when they had reassigned his duties, what they had done is they said that because he's having some people problems or personality conflicts with these other people, what they said was this. We're going to remove him from that project because he can't be a good representative. We're going to then change his position description. And we're going to make this person effectively an expert. His job is going to increase his level of knowledge, nuclear science. He's going to lead a team of experts for nine months, I believe it was. I think it was even longer. Up until from June of 2003 to September of 2004, he's going to lead the subject matter experts to review safety documentation of the reactor. And that was his job. He complained in October of 2003, November of 2003, and February of 2004 about the dangers that he perceived that he had a reasonable belief of. And those dangers where he says in his letters, he refers to that regulation, 10 CFR of 853. And his supervisor then cuts off his ability to apply that regulation. He testifies that he found Mr. Amramokri to be a very inflexible person when it came time to reviewing regulation. And I think that the very crux of this case is that it's not logical that someone with that position, who they testify to extensively in their testimony, that they go ahead, they craft a specific job description just for him. They're saying that this is the person who we want to carry out these duties. He's the right person for this. And then they send this email and they claim that he's actually the very wrong person for this. That essentially, that this is someone who's inflexible and this is someone who shouldn't be working on projects like that because he can't apply the regulation. And I think that what had happened in this case was initially there was some confrontation at Oak Ridge, right or wrong. The administrative judge specifically said that he wasn't going to retry what had happened down there. And that, granted, there was a letter of reprimand. It was probably deserved. And he was taken off that project. But what is at issue in this case is not was he rude to these three or four people down at Oak Ridge. It was why was that email sent after he had made protected disclosures, after Mr. Owen Lowe admitted in testimony that he was aware of at least the October one. And we're saying that the lack of any record that the agency had to show that Mr. Amramokri had a specific problem in applying regulations is contradicted squarely by his new position description, the fact that he was in charge of leading a team of experts, which Neopolis says, I asked him on cross-examination, you wouldn't want this person leading a team of experts. He says, yeah, I wouldn't. That was exactly what his job was to do. So I think that because the standard here is clear and convincing. What exactly, Mr. Fisher, was his whistleblowing? What exactly, in your view, did he say or do the constituted whistleblowing? Fair question, Your Honor. He says here on October 14, 2003, he writes to Secretary Abraham. This is on the joint appendix, page 446 and 447, where he says that there is a retaliation. This is his lawyer who wrote the letter. Appears to be driven not only by his Title VII case, but also by his efforts to apply the Nuclear Safety Rule, 10 CFR 830. He later says that he presented Mr. Lowe with his findings of the review team for the DSA. Mr. Lowe directed that Amar Mokri delete safety significant findings from the executive summary of the DSA, and that he refused to do so in good conscience as a professional engineer, delete safety recommendations found by a team of subject matter experts. I think that, number one, he references a specific regulation. I think it's intuitive. He says that this particular regulation is not being complied with, right? He doesn't say those specific words. That's correct, Your Honor. But he does. I think a reasonable person reading this, especially written by a lawyer, employment law firm, I might add, would understand this to mean that there was some serious safety issue that he was concerned about, about this cask, and that he was instructed to delete these significant findings in this as part of his duties. And that's what he's alleging. And the administrative judge. What is his situation now? He's still working there, correct? He's still working there now. That's correct. And his pay, his grade and pay have not been reduced. That's correct. He's just complained about the nature of his duties. That's correct, that it's a significant reduction in the duties. The expert witness at his trial had testified at the administrative level that essentially he wasn't doing duties at the grade that he was supposed to do, and also that it's common knowledge, really, that the agency has set position descriptions that the employee has to fill, not that it's tailor-made for that employee. You're saying he's performing duties that are way below his position description. He is not performing the duties that are at his level. That's right, Your Honor. I have five minutes left I'd like to reserve. We can save that for rebuttal. I think it's here from the Department of Energy. Thank you. It's sufficient. Ms. Guilfoyle. Good morning, Your Honor. The board's decision that Mr. M. Mroki's request for corrective action should be denied was supported by substantial evidence. The board considered whether the agency had established by clear and convincing evidence that they would have reassigned Mr. M. Mroki and placed him upon a new position description absent any alleged protected disclosures. The board did not actually make a finding as to whether or not there were protected disclosures, but found that it was doubtful that there were. The decision was based on the clear and convincing evidence that the agency would have reassigned him anyway. The board considered the fact that the agency had strong evidence to support its decision to reassign Mr. M. Mroki absent the alleged protected disclosures. The disputes with Mr. M. Mroki regarding his duties and the way to perform them began long before he was placed on a new position description in January 2004. Ms. Guilfoyle, as I understand what Mr. Fisher is saying, he said, look, I admit, or he would acknowledge, I suppose, that he's not challenging that his client was rude and out of line when he went down to Oak Ridge in May of 2003. But he's saying, look, they put me in this new job. After that, they said I was the ideal man for it. And then they took me out of that job after I had made these disclosures with respect to noncompliance concerning the regulation. I mean, that's what you heard him saying, right? What is your response to what he said when he was arguing? Certainly. Well, Mr. M. Mroki, when he was removed from his position as a program manager at Oak Ridge, was placed on a detailed set of duties. That was not a new permanent position description. That was in June of 2003. The detailed duties that he was placed upon was to continue a project that he had previously been working for, a documented safety analysis for a high flux isotope reactor. Mr. M. Mroki's supervisor, Mr. Lowe, testified that he wanted Mr. M. Mroki to finish that job because he was the one who had started it. And he did not believe that it was efficient to change horses midstream on that. However, in January of 2004, a new position was drafted for Mr. M. Mroki, which was to serve as a subject matter expert in nuclear safety. He was placed upon that position in January 2004. However, the high flux isotope reactor project was continuing until September 2004, when by Mr. M. Mroki's own testimony, the project ended and there was nothing further for him to do. He could not continue working on that because there was not any more work. At that point, the agency began to look for new opportunities for Mr. M. Mroki to perform additional duties. And the record has evidence of negotiations between him and his supervisors about what duties Mr. M. Mroki believed was appropriate. His new position description was to serve as a subject matter expert on nuclear safety and was determined to be a GS-15 position based upon the position description by Human Resources. The email that Mr. Fisher refers to was sent in February of 2005, after Mr. M. Mroki had already been placed upon his new position description. In addition, there isn't evidence that Mr. M. Mroki is forbidden from ever commenting on 10 CFR 830 again. The evidence is that his supervisors believe that he was not capable of applying a graded approach, which requires you to take into account the possibility of harm, the magnitude of harm, and that he was deficient in applying that graded approach to older facilities, not that he could never comment upon the nuclear safety rule in any context whatsoever. And that actually goes back to the Oak Ridge incident, because the disputes that caused the rude behavior were based upon whether the graded approach of the nuclear safety rule was being applied. In addition, the board considered the fact that the agency really didn't have any motivation to retaliate against Mr. M. Mroki. The alleged protected disclosures, which were sent to Congressman Markey and Secretary Abraham, there was little evidence that anyone at the agency had any repercussion as a result of them. In fact, Mr. Lowe, Mr. M. Mroki's supervisor, was asked to write a letter back to Mr. M. Mroki's attorney on behalf of the Department of Energy, saying that Mr. M. Mroki was not being asked to violate any rules or regulations, and that the Department of Energy was fully complying with them. And that's about the extent of any action that was made to the Department of Energy as a result of the alleged protected disclosures. For these reasons, we believe that the board's decision that the agency established by clearing convincing evidence that there would have been the reassignment and new duties, regardless of the alleged protected disclosures, are correct. If there's no further questions. Thank you, Ms. Guilfoyle. Mr. Fisher. Your Honor, I think what's very clear in this case, if you look at the letters of reprimand that he got and the reassignment in June of 2003, there is absolutely nothing about his inability to apply regulations. Nothing. It's about, you were rude to Kathy Simmons, you were rude to this guy and that guy. That all came later. And the evidence with that email, it suggests it. It suggests it. It really tells you that. And again, it's just one of the things that the administrative judge, he doesn't put this in his opinion at all. It's like the email doesn't exist. It's a very critical piece of evidence. And the bottom line in these cases is this is, if this were a discrimination case and there's an issue of, you know, did the under McDonnell Douglas, did he disprove the theory or whatever? That's one thing, that's not this case. They had to show by clear and convincing evidence that when they took away his duties of, now you're not gonna apply regulations now. You're not even gonna do what this new thing is. That that was a protected activity and they violated that. They didn't show by clear and convincing evidence that they would have taken those steps anyway. Thank you. Thank you, Mr. Fisher. And thank you, Ms. Guilfoyle. The case is taken under submission. All rise.